**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-01717-NYW-SP

GREGORY SAUL and
TAMMY TUCKER SAUL,

> Plaintiffs,

and

XL SPECIALTY INSURANCE COMPANY,

> Plaintiff-Intervenor,

v.

ECOLAB INC.,

> Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant's Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") [Doc. 62]. Upon review of the Motion and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, the Motion for Summary Judgment is respectfully **GRANTED**.

## BACKGROUND

This products liability action arose out of injuries allegedly caused by a chemical cleaning product on April 4, 2019. *See generally* [Doc. 7 at ¶¶ 4–9]. Broadly, Plaintiff Gregory Saul ("Mr. Saul") alleges that he was seriously injured when a product manufactured by Defendant Ecolab Inc. ("Defendant" or "Ecolab") made contact with his skin while he was at work. [*Id.* at ¶¶ 5, 7–

9].  Mr. Saul and his wife, Tammy Tucker Saul ("Ms. Saul," and collectively with Mr. Saul, "Plaintiffs"), initiated this civil action in the District Court for the City and County of Denver on March 31, 2021 and filed an Amended Complaint on May 27, 2021.  *See* [Doc. 1-8 at 5; Doc. 7].  Defendant removed the case to federal court on June 23, 2021, invoking this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  [Doc. 1 at ¶ 2].  Then, on September 8, 2022, XL Specialty Insurance Company ("Plaintiff-Intervenor" or "XL Specialty"), the workers' compensation insurer for Mr. Saul's employer, filed an Amended Unopposed Motion to Intervene, which this Court granted.  [Doc. 46; Doc. 47; Doc. 48 at ¶ 1].

Plaintiffs assert three claims for relief against Ecolab: (1) strict products liability, asserted by Mr. Saul; (2) negligence, asserted by Mr. Saul; and (3) loss of consortium, asserted by Ms. Saul.  [Doc. 7 at 4–11].[1]  And Plaintiff-Intervenor asserts two claims against Defendant: strict products liability and negligence.  [Doc. 48 at 3–11].

Defendant filed its Motion for Summary Judgment on December 9, 2022, seeking judgment in its favor on each of Plaintiffs' and Plaintiff-Intervenor's claims.  *See* [Doc. 62].  The matter is fully briefed, *see* [Doc. 66; Doc. 68; Doc. 71], and is ripe for resolution.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the

---

[1] Plaintiffs' Amended Complaint does not delineate which Plaintiff brings which claim, but in Plaintiffs' Response to the Motion for Summary Judgment, Plaintiffs clarify that the negligence and strict liability claims are asserted by Mr. Saul and the loss of consortium claim is asserted by Ms. Saul.  [Doc. 66 at 2].

substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation omitted).

"[I]t is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009). In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To satisfy this burden, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of his case or a denial of an opponent's allegation" to defeat summary judgment). In considering the evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Adler*, 144 F.3d at 670.

## UNDISPUTED MATERIAL FACTS

The below material facts are drawn from the Parties' briefing and the record before the Court and are undisputed unless otherwise noted.[2]

1.      Ecolab manufactures and distributes a chemical product called "Victory," which is used in a diluted form to wash fruits and vegetables.  [Doc. 62 at ¶¶ 3–4; Doc. 66 at 3, ¶¶ 3–4;[3] Doc. 62-6 at 5].[4]

2.      At the time of the incident giving rise to this lawsuit, Mr. Saul was employed by Crossmark, Inc. and was assigned to work at a Sam's Club store in Colorado Springs, Colorado. [Doc. 62 at ¶¶ 1, 2, 10; Doc. 66 at 2–3, ¶ 1, 2, 10; Doc. 62-1 at 2; Doc. 62-3 at 8].

---

[2] The Court notes that throughout Defendant's "Reply to Plaintiffs' Statement of Additional Material Facts," Defendant frequently "object[s]" to certain assertions of fact as immaterial or inadmissible, without expressly admitting or disputing the assertion.  *See, e.g.*, [Doc. 71 at 3–7, ¶¶ 1–12, 37–38, 42–47]; *see also* Civ. Practice Standard 7.1D(b)(6)(B) (stating that the moving party, in its reply, must "either admit that the [non-moving party's assertion of] fact is disputed or supply a brief factual explanation for its position that the fact is undisputed.").  It is well-settled that a party need not produce evidence in a form that would be admissible at trial; instead, only the content or substance of the evidence must be admissible at trial.  *See Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995); *see also* Fed. R. Civ. P. 56(c)(2) (a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").   While Defendant asserts that some of Plaintiffs' evidence is inadmissible, it does not argue that the evidence cannot be presented in an admissible form at trial; accordingly, the Court declines to consider Defendant's admissibility arguments.  *See Troudt v. Oracle Corp.*, No. 16-cv-00175-REB-SKC, 2019 WL 1006019, at *3 (D. Colo. Mar. 1, 2019) (declining to consider "undeveloped" hearsay objections at the summary-judgment stage).

[3] Plaintiffs attempt to dispute Defendant's assertion that Victory is used in a diluted form, asserting that the cited evidence "fails to reference that Victory is used in a 'diluted form to wash fruits and vegetables.'"  [Doc. 66 at 3, ¶ 4].  Defendant's Exhibit E, the Victory label, states that "Victory will control the growth of spoilage and decay causing non-public health organisms in wash waters and on the surface of fruits of vegetables" and directs users to "[m]ix Victory with water either batchwise or continuously by adding 1.0 fluid ounce Victory per 16.4 gallons of water."  [Doc. 62-6 at 5].  The Court is unpersuaded that Plaintiffs have established a genuine dispute of fact with respect to the uses of the Victory product.

[4] The admissions and denials of Plaintiffs and Plaintiff-Intervenor are substantively identical.  *Compare* [Doc. 66 at 2–10] *with* [Doc. 68 at 3–4].  For ease of reference, the Court cites only to Plaintiffs' Response in this section.

3.      Ecolab conducted periodic food safety audits at Mr. Saul's workplace.  [Doc. 62 at ¶ 9; Doc. 66 at 3, ¶ 9; Doc. 62-7 at 23:4–17].  On April 4, 2019, an Ecolab employee named Joe Tina ("Mr. Tina") was conducting an audit at the Sam's Club.  [Doc. 62 at ¶¶ 1, 10; Doc. 66 at 2–3, ¶ 1, 10; Doc. 62-1 at 2, 4].

4.      During the audit, Mr. Tina told Mr. Saul that there was a container of Victory that was expired, such that it needed to be disposed of.  [Doc. 62 at ¶ 11; Doc. 66 at 3, ¶ 11; Doc. 62-4 at 97:17–23].

5.      Mr. Saul did not know how to dispose of the Victory product because he had never previously disposed of it.  [Doc. 66 at 6, ¶ 14; Doc. 71 at 5, ¶ 14; Doc. 66-2 at 141:13–23].[5]  Mr. Saul asked Mr. Tina how to dispose of the Victory product.  [Doc. 62 at ¶ 15; Doc. 66 at 4, ¶ 15; Doc. 62-4 at 106:1–3].

6.      Mr. Tina told Mr. Saul that the Victory product could be disposed of in the sink drain.  [Doc. 62 at ¶ 16; Doc. 66 at 4, ¶ 16; Doc. 62-4 at 106:25–107:1].[6]

---

[5] Defendant "disputes Saul's lack of prior knowledge and instruction regarding disposal of Victory," citing generally to several pages of Mr. Saul's deposition transcript and the transcript of a person named Amber Hazelton ("Ms. Hazelton").  *See* [Doc. 71 at 5, ¶ 14].  Defendant does not clearly explain the nature of its dispute or why its cited evidence calls Mr. Saul's testimony into question, nor does Defendant explain Ms. Hazelton's connection to this case.  For these reasons, the Court deems this fact undisputed.  *See Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment."); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[6] The Parties dispute the exact nature of Mr. Tina's response.  Mr. Saul claims that Mr. Tina told him to poke a hole in the Victory container and pour the liquid down the drain.  [Doc. 62-4 at 106:21–107:1].  Defendant contends that Mr. Tina did not tell Mr. Saul to poke a hole in the container, but to dispose of the product using the container's dispenser.  [Doc. 62 at 5 n.2; Doc. 62-8 at 24:2–9].  For the reasons explained below, this dispute is not material to the resolution of the Motion for Summary Judgment.

7.      Mr. Tina did not offer to dispose of the Victory product himself, as that is "not [his] place."  [Doc. 62 at ¶ 12; Doc. 66 at 3, ¶ 12; Doc. 62-7 at 75:14:–20, 79:7–12].[7]

8.      Mr. Saul had previously disposed of empty Victory containers by depositing them in the designated hazardous waste area.  [Doc. 62 at ¶ 14; Doc. 66 at 4, ¶ 14; Doc. 62-4 at 142:1–11].

9.      Mr. Saul did not read the Victory container label prior to his attempt to dispose of the product.  [Doc. 62 at ¶ 8; Doc. 66 at 3, ¶ 8; Doc. 62-4 at 70:21–71:13, 117:17–23, 143:16–19].

10.      After putting on goggles and gloves, Mr. Saul used a ten-inch butcher knife to cut a hole in the Victory container, which resulted in the release of strong fumes.  [Doc. 62 at ¶ 17; Doc. 66 at 4, ¶ 17; *id.* at 9, ¶ 40; Doc. 71 at 7, ¶ 40; Doc. 62-4 at 108:14–21, 120:12–17].

11.      After smelling the fumes, Mr. Saul changed course and put the Victory container into a garbage bag for disposal in a trash bin.  [Doc. 62 at ¶ 18; Doc. 66 at 4, ¶ 18; Doc. 62-4 at 121:4–24].

---

[7] Defendant states that disposal of the Victory product "is not [Mr. Tina's] job."  [Doc. 62 at ¶ 12]. Plaintiffs attempt to dispute the assertion on the basis that "Mr. Tina did not reference that it was not his job to dispose of the Victory Wash."  [Doc. 66 at 3, ¶ 12].  In support, Plaintiffs do not rely on Mr. Tina's testimony, but instead cite *Mr. Saul's* deposition testimony wherein he describes the entirety of the incident that occurred on April 4, 2019.  *See* [*id.* (citing Doc. 66-2 at 96:19–99:13)]. The basis of Plaintiffs' assertion that there is a genuine dispute of fact is unclear.  Insofar as Plaintiffs contend that, because Mr. Saul did not—when recounting the events of April 4, 2019 during his deposition—state that Mr. Tina had informed Mr. Saul that it was not his job to dispose of the expired Victory product, this does not create a genuine dispute of fact as to Mr. Tina's job responsibilities.  Mr. Tina stated multiple times in his deposition that it was "not [his] place" to dispose of the Victory product, *see* [Doc. 62-7 at 75:14–20, 76:18–24, 77:1–7], and also stated that he had never actually physically disposed of expired Victory product at any location.  [*Id.* at 79:7–12].  Plaintiffs have directed the Court to no evidence contradicting these assertions.  *See generally* [Doc. 66].  Accordingly, the Court deems this fact undisputed for purposes of the instant Motion. *See* Fed. R. Civ. P. 56(e)(2).

12.     As Mr. Saul tried to place the garbage bag into a trash can, some of the Victory product spilled onto Mr. Saul's leg, causing a chemical burn.  [Doc. 62 at ¶ 19; Doc. 66 at 4, ¶ 19; *id.* at 9, ¶ 44; Doc. 71 at 7, ¶ 44; Doc. 62-4 at 121:18–21, 122:15–21; Doc. 66-2 at 138:13–25].

## ANALYSIS

Ecolab seeks summary judgment in its favor on each of Plaintiffs' and Plaintiff-Intervenor's claims, arguing that they cannot meet their prima facie burden with respect to any of their asserted theories of liability.  *See* [Doc. 62 at 8].  After first outlining the apparent parameters of the strict liability claim, *see* [*id.* at 8–10], Ecolab asserts that Mr. Saul cannot succeed on either his strict liability or negligence claims, insofar as these claims are based on an alleged failure to warn, due to a lack of evidence establishing causation.  [*Id.* at 10–15].  Next, Ecolab argues that to the extent Mr. Saul's negligence claim is not based on an alleged failure to warn, Ecolab is entitled to summary judgment on that portion of the claim because Plaintiffs cannot establish that Ecolab owed any legal duty to Mr. Saul.  [*Id.* at 15–19].  And finally, Defendant contends that because Mr. Saul's claims fail, then Ms. Saul's loss of consortium claim and XL Specialty's subrogation claims are not viable, either.  [*Id.* at 20].  The Court addresses these arguments below.

## I.      The Scope of Mr. Saul's Strict Liability Claim

The court exercises jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332, and thus applies Colorado law.  *See, e.g., Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240 (10th Cir. 2003) (applying the substantive law of the state the parties agree controls); *Bullock v. Wayne*, 623 F. Supp. 2d 1247, 1252 (D. Colo. 2009) (a federal court exercising diversity jurisdiction applies the law of the forum state).  Colorado law recognizes strict products liability claims based on a manufacturing defect, a design defect, or a failure to warn.  *Walker v. Ford Motor Co.*, 406 P.3d 845, 849 (Colo. 2017).  The Amended Complaint invokes all three theories

of relief. *See, e.g.*, [Doc. 7 at ¶ 24 ("Ecolab knew or should have known at the time the Subject Product left Ecolab's possession, that said product was defective in its warnings, design and manufacture[.]"); *id.* at ¶ 43 ("Ecolab[] breached its duty to the public and Plaintiff Gregory Saul by failing to design, assemble, test, manufacture, provide sufficient warnings and use instructions for, the Subject Product so as to avoid its unsafe and hazardous operational and handling characteristics and safety defects, amongst others.")]. During discovery, Plaintiffs represented that their theory of relief as to the alleged manufacturing defect was that the Victory product was "not consistent with the manufacturing specifications such that the [Victory product] was more caustic and noxious than similarly manufactured Victory Wash." [Doc. 62-10 at 6]. They also contended that the Victory product "was both defective in design and manufacture [in] that the [Victory product] did not have any on-product instructions for the disposal of the actual product" and "did not provide proper instructions regarding how to handle [Victory product] spills and noxious fumes." [*Id.*].

In the Motion for Summary Judgment, Defendant argues that "Plaintiffs have never disclosed any evidence to support their assertion that the chemical content of the Victory product . . . was not consistent with the manufacturing specifications and was more caustic and noxious than similarly manufactured Victory product." [Doc. 62 at 7].[8] In addition, they contend that Plaintiffs' theory of relief as to a design defect "is geared toward a failure to warn theory rather than a design defect." [*Id.* at 9]; *see also generally* [*id.* at 8–10 (Defendant arguing that Plaintiffs

---

[8] To that end, Ecolab attempts to incorporate, by reference, its arguments raised in Defendant's F.R.E. 702 Motion to Exclude Expert Testimony and Opinions from Ryan Radebach [Doc. 62 at 7 n.3]; *see also* [Doc. 60]. The incorporation of a motion into another motion is not contemplated under the plain language of Rule 10(c), *see* Fed. R. Civ. P. 10(c), and Ecolab does not cite (nor could the Court find) any authority that extends Rule 10(c) to the circumstances presented herein. Nevertheless, as explained more fully below, this Court need not reach the issue of whether Mr. Radebach's opinions are admissible to resolve the Motion for Summary Judgment.

have not produced any evidence of a design or manufacturing defect)]. Defendant maintains that Mr. Saul's strict liability claim is based solely on the theory that the warnings and labels affixed to the Victory container were defective—i.e., the strict liability claim is based solely on a failure-to-warn theory. [*Id.* at 7]; *see also* [*id.* at 11 (arguing that the strict liability claim must be dismissed for lack of evidence regarding failure to warn)].

In their Response, Plaintiffs do not contend that Mr. Saul asserts a design-defect or manufacturing-defect claim, and instead advance *only* a failure-to-warn theory of relief. *See* [Doc. 66 at 16 ("Plaintiff has set forth a genuine issue of material fact on the strict liability and negligence causes of action based upon Ecolab's failure to warn.") (capitals omitted)]. Notably, the terms "design defect" or "manufacturing defect" are entirely absent from Plaintiffs' Response. *See generally* [*id.*]. Thus, insofar as Mr. Saul ever advanced a design-defect or manufacturing-defect theory of relief with respect to his strict liability claim, he has abandoned any such claims by failing to raise arguments in defense of that claim in the Response. *See Amica Life Ins. Co. v. Wertz*, 272 F. Supp. 3d 1239, 1245 n.4 (D. Colo. 2017); *Steak n Shake Enters., Inc. v. Globex Co., LLC*, 110 F. Supp. 3d 1057, 1085 (D. Colo. 2015), *aff'd*, 659 F. App'x 506 (10th Cir. 2016). Accordingly, the Court construes the strict liability claim as raising only a failure-to-warn theory.

In assessing whether Defendant has established that it is entitled to summary judgment, the Court first addresses both of Mr. Saul's claims insofar as they are based on an alleged failure to warn. Then, the Court turns to the portion of Mr. Saul's negligence claim that is based on Mr. Tina's alleged instructions about proper disposal of the Victory product. And finally, the Court addresses the claims raised by Ms. Saul and XL Specialty.

## II.     Failure to Warn – Mr. Saul's Strict Liability and Negligence Claims

A manufacturer's failure to warn can give rise to both a strict liability claim and a negligence claim. *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, 1175 (Colo. 1993). "Under a strict liability theory, . . . the focus of the inquiry is whether the defendant failed to warn of particular risks that were known or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution." *Id.* "To succeed on a [strict liability] failure-to-warn claim, the plaintiff bears the burden to prove that the manufacturer of the product gave (1) an inadequate warning of the danger (2) that caused the injury at issue." *Shostrom v. Ethicon, Inc.*, No. 20-cv-01933-WJM-STV, 2021 WL 778994, at *4 (D. Colo. Mar. 1, 2021).

On the other hand, a failure-to-warn negligence claim requires a plaintiff "to prove that a manufacturer's failure to warn of a risk fell below an acceptable standard of care." *Fibreboard*, 845 P.2d at 1175. "When a manufacturer or seller knows or should know of unreasonable dangers associated with the use of its product and not obvious to product users, it has a duty to warn of these dangers; and a breach of this duty constitutes negligence." *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 198 (Colo. 1984). To prevail on a negligence claim based on a failure to warn, the plaintiff must demonstrate (1) the existence of a legal duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) a causal connection between the defendant's breach and the plaintiff's injuries. *Martinez v. Lewis*, 969 P.2d 213, 217 (Colo. 1998).

"Although there is a distinction between claims for negligence and strict liability based on a failure to warn, the same evidence will frequently be used to establish both claims." *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1117 (D. Colo. 2000). Despite the differences between the two claims, "Colorado case law . . . suggests that there need not be a rigid distinction

between negligence and strict liability failure to warn concepts." *Romero v. Int'l Harvester Co.*, 979 F.2d 1444, 1452 (10th Cir. 1992). "This is particularly so in cases where the same undisputed evidence defeats an essential element common to both claims: causation." *Baca v. Clark*, No. 06-cv-00714-EWN-PAC, 2007 WL 2022054, at *4 (D. Colo. July 9, 2007).

In *Baca*, the plaintiff asserted several claims—including both strict liability and negligence failure-to-warn claims based on a failure-to-warn theory—due to injuries she sustained when she fell off of a ladder placed against scaffolding she purchased from the defendants. *Id.* at *1, *4. Though the scaffolding arrived with a code for safe practices and was affixed with warning labels, the plaintiff stated in her deposition that she did not read them, viewing them as a "busy piece of paperwork." *Id.* at *3, *5. Based on this testimony, the court granted summary judgment in favor of the defendant upon concluding that the plaintiff had "neglected to demonstrate her injuries to be causally connected to [the defendant's] alleged failure to warn," remaining unpersuaded by the plaintiff's assertion that if she had been provided with proper instructions, she "would have read them." *Id.* at *4 (concluding that the plaintiff's "selfserving, conclusory assertion" was "insufficient to overcome her admission that she did not read the warnings she received.").

Similarly, in *Kirkbride v. Terex USA, LLC*, 798 F.3d 1343 (10th Cir. 2015), the Tenth Circuit—applying Utah law—affirmed the grant of summary judgment in favor of the defendant where the plaintiff argued that the warnings on a product were inadequate, but where "there was no evidence that a better warning would have prevented [the plaintiff's] injury." *Id.* at 1349. Specifically, the plaintiff in *Kirkbride* admitted that he had not read any warnings or manuals prior to using the subject product. *Id.* at 1350. The Tenth Circuit concluded that any failure to provide an adequate warning could not have caused the plaintiff's injuries because, based on the plaintiff's

failure to read any warnings, the injury would have occurred regardless of the defendant's conduct. *Id.* at 1349.

Courts in other jurisdictions have similarly concluded that where a claimant did not read the warnings provided, the claimant cannot succeed on a failure-to-warn claim for lack of causation. *See, e.g.*, *Tropple v. Black & Decker (U.S.) Inc.*, No. 13-cv-2907 PAM/LIB, 2015 WL 4992011, at *8 (D. Minn. Aug. 20, 2015) ("[The plaintiff] concedes that he failed to read the warning on the grinder, which referred him to the warnings in the manual about inadvertent startup. This admission severs any causal link between the alleged inadequate warning and his injury.") (citation omitted); *Jakab v. Lowe's Home Ctrs., LLC*, No. 17-80165-CIV, 2018 WL 3899295, at *3 (S.D. Fla. June 6, 2018) ("Under Florida law, a plaintiff's failure to read the warning negates proximate cause in a failure to warn case."); *Terry for Est. of Terry v. Monsanto Co.*, 565 F. Supp. 3d 1359, 1364 (M.D. Ga. 2021) ("Mr. Terry clearly testified that he did not read the warning labels on the Roundup® products prior to applying the products.  Absent evidence to the contrary, Plaintiffs' failure to warn claim fails as a matter of law.").

Here, Defendant contends that Mr. Saul's claims based on a failure-to-warn theory must fail because the undisputed facts demonstrate that any alleged failure to warn did not cause Mr. Saul's injuries.  [Doc. 62 at 11, 15].  More specifically, Defendant notes that Mr. Saul "admitted that he did not read the warning label or safety information on the Victory product before the incident," and for this reason, "the alleged deficiencies of the product label and literature did not cause his alleged injuries."  [*Id.* at 11].  Plaintiffs do not respond directly to this argument or point

the Court to any evidence establishing a genuine issue of material fact with respect to whether any alleged failure to warn caused Mr. Saul's injuries. *See generally* [Doc. 66].[9]

It is undisputed that Mr. Saul did not read the Victory product label prior to the April 4, 2019 incident. [Doc. 62 at ¶ 8; Doc. 66 at 3, ¶ 8; Doc. 62-4 at 70:21–71:13, 117:17–23, 143:16–19]. Specifically, Mr. Saul admitted in his deposition:

Q.    What about on the Victory product, did you read the label?

A.    Not before [the incident], no.  We were instructed to put it on the wall and plug it in and that's how we used it.

* * *

Q.    Okay.  So you never read the label that was on the Victory product, correct?

A.    Not until afterwards.

Q.    Okay.  So you did read it at some point?

A.    After the incident, yes.

Q.    Okay.  So you have read the label?

A.    After the incident.

* * *

Q.    And you testified earlier that you had not read the labels on the Victory container prior to this incident?

A.    Correct.  And honestly, I'm really grateful that I had enough sense to take a picture of all four sides of the bottle before I drove myself to the hospital.

Q.    And what did you use those pictures for at the hospital?

---

[9] XL Specialty's Response to the Motion for Summary Judgment is essentially identical to Plaintiffs' Response.  Indeed, the Response raises the same arguments and relies upon the same authorities—in the same order and using the same organization—as Plaintiffs' Response. *Compare, e.g.*, [Doc. 66 at 11–15] *with* [Doc. 68 at 7–10].  For purposes of brevity, the Court will only reference Plaintiffs' arguments, but the Court's analysis applies equally to any arguments raised by XL Specialty.

A.      They asked me, What happened to you?  And I handed them my phone.
        This is what happened to me.  Read the label.  *Until that time, though, I had
        never read a label off of that*.  I didn't know it was so caustic.  I knew we
        used it for oranges.  I thought to myself, Well, how bad could it be?  You're
        consuming it.

[Doc. 62-4 at 71:10–13, 117:17–23, 144:20–145:10 (emphasis added)].  Mr. Saul also stated that

it was not his practice while employed at Crossmark to read product labels:

Q.      While you were employed at Crossmark, did you receive any training
        regarding reading labels on chemical products?

A.      No.

Q.      Were you told to read the labels on chemical product?

A.      No.

Q.      Did you -- did you read the labels on chemical products that you used?

A.      No, because really only -- it was only really used was [sic] bleach and
        sanitizer.  Those are really the only two we were allowed to use.  You can't
        use any special soap in the -- anything.  It has to be what Sam's Club is
        approved for is all we could use.

[*Id.* at 70:21–71:9].

Plaintiffs do not refute this evidence or otherwise establish a genuine issue of material fact

with respect to whether Mr. Saul failed to read the Victory product's warning label(s).  *Compare*

*Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 989–90 (N.D. Cal. 2014) (finding summary judgment

inappropriate where there was a genuine dispute of fact as to whether the plaintiff read the

warnings, where he stated in his deposition that he "probably" did not read the warning in its

entirety but that he "always go[es] through the safety warnings").

Plaintiffs' reliance on their expert's opinion that the Victory container's warnings were

defective, *see* [Doc. 66 at 7; Doc. 66-5 at 6–7], cannot save Mr. Saul's failure-to-warn claims.

Indeed, the Response contains no legal authority—and this Court could not find any—that suggests

otherwise.  Because it is undisputed that Mr. Saul did not read the warning labels prior to his attempted disposal of the product, it follows that any better warnings or instructions would not have prevented Mr. Saul's injury, which would have occurred "regardless of the defendant's conduct." *Kirkbride*, 798 F.3d at 1349; *see also* [Doc. 66-2 at 232:16–21 ("Mr. Saul stating that even if he had read the labeling, he would have followed Mr. Tina's instructions over the label instructions)].  "[T]he plaintiff must establish causation beyond mere possibility or speculation," *Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P.2d 714, 719 (Colo. 1987), and Mr. Saul has not done so here.

The Court acknowledges that causation is a question typically reserved for the jury. *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1113 (D. Colo. 2000).  However, because it is undisputed that Mr. Saul did not read the Victory container's label prior to attempting to dispose of the product, no reasonable jury could find in Mr. Saul's favor on the issue of causation. *Baca*, 2007 WL 2022054, at *5.  Accordingly, Defendant is entitled to summary judgment on Mr. Saul's strict liability claim, as well as his negligence claim insofar as it is based on an alleged failure to warn.  The Motion is thus **GRANTED** with respect to those claims.

## III.    Mr. Tina's Disposal Instructions – Mr. Saul's Negligence Claim

Mr. Saul's negligence claim is also based on "Mr. Tina's conduct in directing [Mr. Saul] to dispose of the expired Victory Wash and in providing incorrect instructions on how to dispose of the Victory Wash."  [Doc. 66 at 13]; *see also* [Doc. 7 at ¶ 6 ("The Ecolab Inc. technician instructed Mr. Saul to pour the Subject Product down the drain.")].  As mentioned above, to prevail on a negligence claim, a plaintiff must demonstrate that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach caused the plaintiff's injury.  *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992).  Ecolab

argues that Mr. Saul cannot succeed on his negligence claim because he cannot demonstrate that he was owed any duty from Ecolab. [Doc. 62 at 15]. More specifically, Ecolab asserts that (1) pursuant to OSHA regulations, it was Crossmark, not Ecolab, that owed a duty to train Mr. Saul, [*id.* at 16]; and (2) Mr. Tina's "alleged statement" instructing Mr. Saul to dispose of the Victory product is insufficient to create a duty owed by Ecolab to Mr. Saul under the "assumed duty" doctrine. [*Id.* at 17–19];[10] *see also Jefferson Cnty. Sch. Dist. R-1 v. Justus By & Through Justus*, 725 P.2d 767, 770 (Colo. 1986) ("[A] party may assume duties of care by voluntarily undertaking to render a service.").

In response, Plaintiffs assert that they have "clearly established that Ecolab was negligent." [Doc. 66 at 11 (capitals omitted)]. While the bulk of Defendant's argument is based on the assumed duty doctrine, Plaintiffs do not contend that Ecolab assumed any duty to Mr. Saul by voluntarily rendering a service to him. Instead, they maintain that Ecolab owed Mr. Saul a duty based on general common law negligence principles. [*Id.* at 11–15]. In addition, they argue that OSHA regulations "do[] not relieve Ecolab of liability with respect to the chemicals distributed to Sam's Club." [*Id.* at 15]. The Court limits its analysis to the purported sources of legal duty discussed in Plaintiffs' Response.

---

[10] Ecolab also argues that Plaintiffs "cannot overcome the rebuttable presumptions in Ecolab's favor imposed by" § 13-21-403 of the Colorado Revised Statutes. [Doc. 62 at 19 (capitals omitted)]. This statute provides that "[i]n any product liability action, it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product" complied with all applicable federal regulations and that "[t]en years after a product is first sold for use or consumption, it shall be rebuttably presumed that the product was not defective and that the manufacturer or seller thereof was not negligent and that all warnings and instructions were proper and adequate." Colo. Rev. Stat. § 13-21-403(1)(b), (3). The Court need not address this argument or determine whether any such presumption applies to resolve the Motion for Summary Judgment.

Whether a duty exists is a question of law to be decided by the Court. *Lopez v. Trujillo*, 397 P.3d 370, 374 (Colo. 2017). To determine whether a defendant owed a legal duty to a plaintiff, courts consider a number of factors, including "(1) the risk involved; (2) the foreseeability of harm to others and likelihood of injury as weighed against the social utility of the actor's conduct; (3) the magnitude of the burden of guarding against the injury or harm; and (4) the consequences of placing the burden on the actor." *Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 104 (Colo. App. 2008) (quotation omitted). "In determining whether a defendant owes a duty to a particular plaintiff, the law distinguishes between acting and failure to act," i.e., "misfeasance, which is active misconduct that injures others, and nonfeasance, which is a failure to take positive steps to protect others from harm." *Smit v. Anderson*, 72 P.3d 369, 372 (Colo. App. 2002). The Court focuses on whether Ecolab owed a duty to Mr. Saul in the context of misfeasance,[11] drawing all factual

---

[11] Plaintiffs primarily argue that this is a misfeasance case, *see* [Doc. 66 at 12–13], but also alternatively argue that this is a nonfeasance case. [*Id.* at 14]. "[I]n nonfeasance cases, the plaintiff has the added burden of establishing that a special relationship exists between the parties such that social policy justifies the imposition of a duty to act." *Montoya*, 216 P.3d at 105. Plaintiffs have not established the existence of a special relationship, which is a relationship "predicated on 'some definite relation between the parties of such a character that social policy justifies the imposition of a duty to act.'" *Ireland v. Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1228 (D. Colo. 2002) (quoting *Univ. of Denver v. Whitlock*, 744 P.2d 54, 58 (Colo. 1987)). The Colorado Supreme Court clearly articulated that when the theory of negligence is based on the failure to act, i.e., nonfeasance, "the existence of a duty has been recognized only during the last century in situations involving a limited group of special relationships between parties." *N.M. by & through Lopez v. Trujillo*, 397 P.3d 370, 374 (Colo. 2017) (citing *Whitlock*, 744 P.2d at 57); s*ee also Fine v. Tumpkin*, 330 F. Supp. 3d 1246, 1253 (D. Colo. 2018) (observing that under Colorado law, nonfeasance cases require the party asserting negligence to establish "that a special relationship exists between the parties such that social policy justifies the imposition of a duty to act" (quotation omitted)). Indeed, the *N.M.* court explained that "we have generally declined to impose a duty of care in cases involving a defendant's nonfeasance, absent a special relationship between the parties." *N.M.*, 397 P.3d at 374. Colorado has "recognized only the following types of special relationships: (1) common carrier/passenger, (2) innkeeper/guest, (3) possessor of land/invited entrant, (4) employer/employee, (5) parent/child, and (6) hospital/patient." *Lopez*, 397 P.3d at 374. The relationship between Mr. Saul and Ecolab does not plainly fit within one of these categories, and Plaintiffs do not meaningfully argue, or present any legal authority showing, that a special relationship exists in this context. *See* [Doc. 66 at 14].

inferences in favor of Plaintiffs and assuming (though disputed by Ecolab) that Mr. Tina told Mr. Saul to poke a hole in the Victory container and pour it down the drain. [Doc. 66 at ¶ 7, 22].

In assessing the common law factors related to duty, "[n]o one factor is controlling and the issue essentially comes down to 'fairness under contemporary standards.'" *Fine v. Tumpkin*, 330 F. Supp. 3d 1246, 1253 (D. Colo. 2018) (quoting *Montoya*, 216 P.3d at 104). In essence, the question is "whether reasonable persons would recognize a duty and agree that it exists." *Lopez*, 399 P.3d at 753. "A court's conclusion that a duty does or does not exist is an expression of the sum total of those considerations of policy which lead the law to say the plaintiff is or is not entitled to protection." *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo.1987) (alteration marks and quotation omitted). The Court acknowledges that the risk of injury arising from direct skin exposure to toxic chemicals is serious. However, when weighed against the other three factors, the Court concludes that reasonable persons would not recognize any duty of care owed by Ecolab to Mr. Saul under the circumstances of this case.

**_Foreseeability of Harm and Likelihood of Injury_**. Foreseeability, insofar as it is an essential element of duty, is a question of law to be resolved by the Court. *Westin Operator, LLC v. Groh*, 347 P.3d 606, 614 n.5 (Colo. 2015). "[F]oreseeability is based on common sense perceptions of the risks created by various conditions and circumstances." *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 48 (Colo. 1987). While the Parties dispute the exact nature of Mr. Tina's disposal instructions, it is undisputed that Mr. Tina told Mr. Saul that the Victory product could be disposed of in the sink. [Doc. 62 at ¶ 16; Doc. 66 at 4, ¶ 16; Doc. 62-4 at 106:25–107:1]. In addition to this directive, Plaintiffs have also presented evidence that—and it is Plaintiffs' position that—Mr. Tina advised Mr. Saul that if he were in Mr. Saul's position, he "would poke a hole in [the Victory container] and pour it down the drain." *See* [Doc. 66 at 7, ¶ 22; Doc. 66-2 at 98:11–

14].  Plaintiffs contend that "it was clearly foreseeable that [Mr. Saul] would use a knife to cut open the Victory Wash container to dispose of it, as Plaintiff was instructed to do by the Ecolab employee who Plaintiff trusted."  [Doc. 66 at 16].  However, Plaintiffs do not contend that Mr. Saul's injury immediately followed the puncture of the container.  They instead state that "Mr. Saul thought that if he could pour the Victory Wash down the drain, he could certainly throw it away."  [*Id.* at 9, ¶ 43; Doc. 66-2 at 121:7–12].  According to Plaintiffs, Mr. Saul then grabbed a plastic trash bag and "tried to put the Victory Wash container in the trash bag," but "as Mr. Saul was trying to place the garbage bag with the Victory Wash into the trash," the "Victory Wash melted the bag and the product ended up all over [Mr. Saul's] leg and soaked his pants."  [Doc. 66 at 9, ¶¶ 43–44; Doc. 66-2 at 121:13–21, 122:8–11, 123:4–13].  It is undisputed that the Victory product spilled onto Mr. Saul's leg as he was placing the garbage bag containing the punctured Victory container into a trash can.  [Doc. 62 at ¶ 19; Doc. 66 at 4, ¶ 19; *id.* at 9, ¶ 44; Doc. 71 at 7, ¶ 44; Doc. 62-4 at 121:18–21, 122:15–21; Doc. 66-2 at 138:13–25].

Plaintiffs do not argue (or present evidence demonstrating) that Mr. Tina instructed Mr. Saul to place the punctured Victory container into a trash bag or trash can.  *See generally* [Doc. 66].  Instead, their theory of relief is based on Mr. Tina's alleged instruction to puncture a hole in the Victory container.  [*Id.* at 16].  But even construing all reasonable inferences in Plaintiffs' favor, it was not foreseeable as a matter of law, based on common sense perceptions of risks created by the circumstances, that after Mr. Tina allegedly instructed Mr. Saul that he could puncture the Victory container and pour the expired Victory product down the sink, Mr. Saul would then proceed to place the punctured Victory container, which apparently still held product, into a plastic garbage bag, that the Victory product would melt the garbage bag, and that the

Victory product would spill onto Mr. Saul's pants as he was attempting to place the plastic garbage bag containing the punctured Victory container into a trash can.

The Court finds the Tenth Circuit's decision in *Ayala v. United States*, 49 F.3d 607 (10th Cir. 1995), instructive here. The *Ayala* case arose out of the deaths of fifteen miners who were killed in an underground mine explosion. *Ayala*, 49 F.3d at 609. The plaintiffs asserted a negligence claim against the United States, arguing that the government's Mine Safety and Health Administration ("MSHA") gave negligent technical assistance to the owner of the mine. *Id.* Approximately three years before the explosion, a MSHA mine inspector visited the mine to approve a lighting modification, as required by federal regulation. *Id.* at 609–10. One of the miners asked the MSHA inspector where to connect the add-on lights to the power supply, and the inspector instructed that the connection should be made below the main circuit breaker. *Id.* at 610. After receiving that answer from the inspector, the miner drew a wiring diagram showing where he believed the power connection should be made—below the main circuit breaker but above a methane monitor—and the lights were installed accordingly, such that the add-on lights were not automatically de-energized by the methane monitor when methane concentration levels spiked. *Id.* Then, nine days before the explosion, a new cover plate with a manual light switch was installed, the installation of which left an opening in the flange of the cover plate. *Id.* When the miners manually switched off the light, the methane that had entered the compartment ignited, and the fire escaped through the opening in the cover plate and ignited methane in the mine, causing the explosion. *Id.* The plaintiffs attributed the explosion to the placement of the power connection, claiming that if the lights had been automatically de-energized by the methane monitor, the miners would not have used the manual light switch, and argued that MSHA had owed and breached a duty of care to the plaintiffs under Colorado common law principles. *Id.* at 610–11.

Weighing the relevant factors under Colorado law, the Tenth Circuit concluded that "MSHA owe[d] no duty of care to mine operators in its provision of technical assistance." *Id.* at 611. It decided, *inter alia*, that it was "largely unforeseeable" that the MSHA inspector's technical assistance would lead to a methane explosion. *Id.* The Tenth Circuit determined that even if it was foreseeable that the miner would draft an incorrect diagram based on the MSHA inspector's advice, "the subsequent chain of events was not foreseeable"—namely, the MSHA inspector could not have foreseen that the mining company would later install a manual on-off switch, creating a gap in the explosion-proof compartment that was large enough to permit the escape of methane gas. *Id.* at 612. "Thus, the actual events that led to the explosion were not foreseeable at the time [the inspector] answered [the miner's] question." *Id.*

Like *Ayala*, the actual events that led to Mr. Saul's injury—the placement of a punctured Victory container into a plastic trash bag, the melting of the trash bag, and the attempt to place that trash bag into a trash can—were not reasonably foreseeable to Mr. Tina at the time Mr. Tina allegedly told Mr. Saul that he could cut a hole into the Victory container and pour the Victory product down the sink. Even if the social utility of Mr. Tina's conduct is minimal, the subsequent events leading to Mr. Saul's injury were so unforeseeable that this factor weighs against finding a duty.

***Burden of Guarding Against Harm***. The Court must also consider "the magnitude of the burden of guarding against injury or harm." *Taco Bell, Inc.*, 744 P.2d at 46. Plaintiffs argue that the burden is "not great at all" because "there was no burden in guarding against the injury as Mr. Tina merely had to properly advise [Mr. Saul] on how to dispose of the Victory Wash, or supervise [Mr. Saul] in its disposal, or contact another person properly trained in the disposal of the product to do so." [Doc. 66 at 13]. But Plaintiffs have presented no evidence that Mr. Tina *himself* knew

of the proper procedure for disposing of expired Victory product or that instructing employees of Ecolab's customers is part of Mr. Tina's job responsibilities; as explained above, it is undisputed that providing instruction on proper disposal methods of the Victory product is "not [Mr. Tina's] place." [Doc. 62-7 at 75:14:–20, 79:7–12]. Requiring a food-safety auditor to learn how to safely dispose of noxious chemicals, and to then instruct external employees as to how to properly dispose of those chemicals, would likely impose a significant burden on that auditor and the auditor's employer. *See Mid-Century Ins. Co. v. InsulVail, LLC*, 592 F. App'x 677, 685 (10th Cir. 2014) ("[A] duty to guard against wet sprinkler pipes from freezing would have required InsulVail not only to know about a wet sprinkler system but also to evaluate and address the vulnerability of that system as a whole, tasks that would constitute a substantial burden on routine installation installers.") (applying Colorado law); *see also Dagon v. BNSF Ry. Co.*, No. 3:19-cv-00417-JPG, 2022 WL 3999802, at *4 (S.D. Ill. Sept. 1, 2022) ("It is not reasonable for BNSF to go into a U.S. Steel facility and premises and supervise and train U.S. Steel employees."). This factor cautions against imposing a duty.

**Consequences of Placing the Burden on the Actor**. Finally, the Court considers "the consequences of placing the burden" on Mr. Tina to instruct non-Ecolab employees about safe disposal of Victory. *Taco Bell, Inc.*, 744 P.2d at 46. Plaintiffs argue that placing the burden on Mr. Tina would be "beneficial as it would require the same degree of energy and effort for Mr. Tina to properly advise Mr. Saul on how to dispose of the Victory Wash . . . as it would to incorrectly instruct Mr. Saul." [Doc. 66 at 13]. Respectfully, the Court is not persuaded that the relevant inquiry is how much time or energy would be expended by Mr. Tina in providing disposal advice to employees, but instead the legal consequences of imposing a duty on a manufacturer and/or its employees to properly instruct other employees—not the manufacturer's own

employees, but employees of other companies which happen to use the manufacturer's product—on the proper disposal of hazardous chemicals. This would "shift the responsibility for safety away from" Mr. Saul's workplace and onto Ecolab, *Ayala*, 49 F.3d at 612, and significantly expand the manufacturer's operations and potential exposure to legal liability. *Cf. Dagon*, 2022 WL 3999802, at *4 (opining that the plaintiff's theory of the case, which would place the burden on a rail company to train persons on rail safety "charges BNSF with potential liability with everyone who encounters a BNSF-owned train."). This factor also weighs against finding a legal duty here.

In sum, even construing all of the evidence in Plaintiffs' favor and assuming that the jury would find in Plaintiffs' favor on all disputes of fact, the common law factors caution against imposing a legal duty on Ecolab to affirmatively instruct and train all individuals who may come into contact with its product how to properly dispose of that product; simply put, "reasonable persons would [not] recognize a duty and agree that it exists" in the circumstances of this case. *Lopez*, 399 P.3d at 753.

Finally, Plaintiffs suggest, in response to an argument raised by Defendant, that Ecolab owed Mr. Saul a duty under 29 C.F.R. § 1910.1200,[12] which provides:

> This section requires chemical manufacturers or importers to classify the hazards of chemicals which they produce or import, and all employers to provide information to their employees about the hazardous chemicals to which they are exposed, by means of a hazard communication program, labels and other forms of warning, safety data sheets, and information and training. *In addition, this section requires distributors to transmit the required information to employers.* (Employers who do not produce or import chemicals need only focus on those parts of this rule that deal with establishing a workplace program and communicating information to their workers.)

---

[12] Both Parties cite 29 C.F.R. § 1910.2100, *see* [Doc. 62 at 12; Doc. 66 at 15], which does not appear to exist. The Court assumes that the Parties intended to cite to § 1910.1200, which contains the language referenced by the Parties.

29 C.F.R. § 1910.1200(b)(1) (emphasis added).  Plaintiffs suggest that this section contemplates a "requirement that distributors (such as Ecolab) transmit the required information to employers," such that this regulation "does not relieve Ecolab of liability with respect to the chemicals distributed to Sam's Club given Ecolab's responsibility to convey information regarding the hazardous chemicals."  [Doc. 66 at 15].

Insofar as Plaintiffs' argument can be construed as an assertion that this regulation required Mr. Tina to provide accurate disposal information to Mr. Saul, the Court is respectfully unpersuaded by this argument.  Elsewhere, the regulation provides that distributors must provide "safety data sheets" to *employers*—i.e., Sam's Club and/or Crossmark—not *Mr. Saul*.  *See, e.g.*, 29 C.F.R. §§ 1910.1200(g)(6)–(7); *see also id*. § 19.10.1200(g)(2) (setting out the content requirements of safety data sheets).  Plaintiffs do not argue or direct the Court to evidence showing that Ecolab failed to comply with this regulation or that any failure to comply caused Mr. Saul's injuries.  *See generally* [Doc. 66].[13]  Nor do Plaintiffs direct the Court to any specific regulatory provision placing a duty on a distributor's employee to properly train external employees; instead, the regulation places the burden of transmitting adequate safety information to employees on the *employer*.  *See* 29 C.F.R. § 1910.1200(a)(1) ("The transmittal of information is to be accomplished by means of comprehensive hazard communication programs, which are to include container labeling and other forms of warning, safety data sheets and employee training."); *id.* § 1910.1200(e) ("Employers shall develop, implement, and maintain at each workplace, a written hazard communication program. . . .").  Accordingly, this argument does not persuade the Court against entering summary judgment in Defendant's favor.

---

[13] Although Plaintiffs contend, for example, that the Sam's Club store did not have a "safety data sheet for Victory Wash," *see* [Doc. 66 at 6, ¶ 18], they do not contend that Ecolab failed to provide a safety data sheet to Sam's Club.  *See generally* [*id.*].

"A negligence claim fails when it is based on circumstances for which the law does not impose a duty." *English v. Griffith*, 99 P.3d 90, 93 (Colo. App. 2004).  Because Plaintiffs have not demonstrated that Ecolab owed any duty to Mr. Saul, Mr. Saul cannot establish, as a matter of law, that Ecolab was negligent.  Accordingly, the Motion for Summary Judgment is **GRANTED** with respect to the remaining portion of the negligence claim.

## III.  Remaining Derivative Claims

Finally, Ecolab asserts that Ms. Saul's loss of consortium claim and XL Specialty's subrogation claims[14] are derivative of and fall with Mr. Saul's claims.  [Doc. 62 at 20].  Plaintiffs' argument in opposition is reliant on the survival of Mr. Saul's strict liability and negligence claims, asserting that because these claims are viable, Ms. Saul's loss of consortium claim is, too.  [Doc. 66 at 18–19].  That is, Plaintiffs do not argue that the loss of consortium claim is not derivative of Mr. Saul's claims or otherwise argue that the claim can survive alone.  *See* [*id.*].  And XL Specialty does not respond to Ecolab's argument at all.  *See generally* [Doc. 68].

Derivative claims "depend entirely upon the right of the injured person to recover," *Colo. Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156, 1164 (Colo. 2000), and "[a] derivative claim is destroyed if the underlying personal injury claim is unsuccessful on the merits." *Draper v. DeFrenchi-Gordineer*, 282 P.3d 489, 495 (Colo. App. 2011) (quotation omitted).  "[L]oss of consortium claims are subject to the same defenses available to the underlying personal injury claim." *Jorgensen*, 992 P.2d at 1164; *see also Pertile v. Gen. Motors, LLC*, No. 15-cv-00518-

---

[14] Under the Workers' Compensation Act, "if an employee injured by a third party elects to receive workers' compensation benefits, the workers' compensation insurer receives an 'assignment' of the 'cause of action' that the injured employee might have against the third party.  This 'assignment,' however, is not an outright ownership interest in the injured employee's claim. Instead, the WCA is clear that an insurer, having paid benefits, is subrogated to the underlying claims the employee would have against a third-party tortfeasor." *Delta Air Lines, Inc. v. Scholle*, 484 P.3d 695, 699–700 (Colo. 2021).

WJM-NYW, 2017 WL 4117908, at *10 (D. Colo. Sept. 15, 2017).   And in the workers'
compensation context, "[t]he limitations and restrictions on the employee's rights 'necessarily'
apply to the insurer's 'derivative' rights of subrogation." *Harms v. Williamson*, 956 P.2d 649, 652
(Colo. App. 1998) (quoting *Tate v. Indus. Claim Appeals Off. of State of Colo.*, 815 P.2d 15, 18
(Colo. 1991)); *see also Delta Air Lines, Inc. v. Scholle*, 484 P.3d 695, 700 (Colo. 2021) ("[T]he
[worker's compensation] insurer's subrogation right is derivative of the employee's rights.").

Because Ms. Saul's claim and XL Specialty's claims are derivative of Mr. Saul's claims,
and because Defendant is entitled to summary judgment on Mr. Saul's claims, the remaining
derivative claims cannot survive.   Indeed, these claimants have given the Court no reason to not
dismiss these claims.   Accordingly, the Motion for Summary Judgment is **GRANTED** with respect
to Ms. Saul's loss-of-consortium claim and XL Specialty's subrogation strict liability and
negligence claims.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Defendant's Motion for Summary Judgment [Doc. 62] is **GRANTED**;

(2)   Judgment is **ENTERED** in favor of Defendant and against Plaintiffs and Plaintiff-
Intervenor on all claims in this case;

(3)   Defendant is **AWARDED** its costs pursuant to Fed. R. Civ. P. 54 and
D.C.COLO.LCivR 54.1;

(4)   Defendant's F.R.E. 702 Motion to Exclude Expert Testimony and Opinions from
Ryan Radebach [Doc. 60] is **DENIED as moot**; and

(5)    The Clerk of Court is directed to close this case.


DATED:  June 9, 2023                              BY THE COURT:

                                                  Nina Y. Wang
                                                  United States District Judge